**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

**ALIGN TECHNOLOGY, INC.,**

Plaintiff,

v.

**CLEARCORRECT OPERATING, LLC,**
**CLEARCORRECT HOLDINGS, INC., &**
**INSTITUT STRAUMANN AG,**

Defendants.

---

**CLEARCORRECT OPERATING, LLC,**
**CLEARCORRECT HOLDINGS, INC., &**
**STRAUMANN USA, LLC,**

Counterclaim-Plaintiffs,

v.

**ALIGN TECHNOLOGY, INC.,**

Counterclaim-Defendant.

**Case No. 6:24-cv-00187-ADA-DTG**

**JURY TRIAL DEMANDED**

**COUNTERCLAIM-PLAINTIFFS' OPPOSITION TO**
**COUNTERCLAIM-DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

BACKGROUND ........................................................................................................................2

ARGUMENT ...........................................................................................................................4

    A.    The Antitrust Counterclaims Are Not Time Barred ................................................4

    B.    Align's Patent Assertions Do Not Negate ClearCorrect's Antitrust Injury ............6

    C.    The Antitrust Counterclaims Allege Actionable Monopolistic Conduct ................6

        1.    The *De Facto* Exclusivity Allegations Alone Constitute Exclusionary Conduct .......................................................................................................7

            a.    The Counterclaims Allege *De Facto* Exclusive Dealing .................8

            b.    Align's Conduct Substantially Forecloses Competition ................15

        2.    Align's Invisalign-iTero Tie Is Anticompetitive .......................................16

CONCLUSION ......................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Laboratories v. Teva Pharmaceuticals USA, Inc.*,
432 F. Supp. 2d 408 (D. Del. 2006)....................................................13

*Advanced Business Sys. & Supply Co. v. SCM Corp.*,
415 F.2d 55 (4th Cir. 1969) ...........................................................11

*American President Lines, LLC v. Matson, Inc.*,
633 F. Supp. 3d 209 (D.D.C. 2022)................................................13, 15

*Arisa Networks, Inc. v. Cisco Sys., Inc.*,
2018 WL 11606358 (N.D. Cal. Feb. 14, 2018) ...................................6

*Arista Networks, Inc. v. Cisco Sys., Inc.*,
2017 WL 6102804 (N.D. Cal. Oct. 10, 2017)......................................6

*Associated Radio Service Co. v. Page Airways, Inc.*,
624 F.2d 1342 (5th Cir. 1980) ......................................................10

*Bell v. Dow Chem. Co.*,
847 F.2d 1179 (5th Cir. 1988) .....................................................5, 19

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*,
176 F. Supp. 3d 606 (W.D. La. 2016)...............................................8

*Chandler v. Phx Servs, L.L.C.*,
45 F.4th 807 (5th Cir. 2022) ..........................................................5

*Chase Manufacturing, Inc. v. Johns Manville Corp.*,
84 F.4th 1157 (10th Cir. 2023) ...................................................15, 18

*Chatham Condominium Ass'ns. v. Century Village, Inc.*,
597 F.2d 1002 (5th Cir. 1979) .......................................................16

*City of Mishawaka v. Am. Elec. Power Co.*,
616 F.2d 976 (7th Cir. 1980) ........................................................10

*Colucci v. Health First, Inc.*,
2021 WL 4304742 (M.D. Fla. Aug. 12, 2021) ...................................12

*Covad Commc'ns Co. v. Bell Atlantic Corp.*,
398 F.2d 666 (D.C. Cir. 2005) .......................................................19

*Dinosaur Financial Grp. LLC v. S&P Global, Inc.*,
  2023 WL 4562031 (S.D.N.Y. July 14, 2023) ........................................................18

*E.R. v. Jasso*,
  573 F. Supp. 3d 1117 (W.D. Tex. 2021).................................................................8

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)..............................................................................................19

*Fotobom Media, Inc. v. Google LLC*,
  2024 WL 1603968 (D.D.C. Feb. 27, 2024) ....................................................17, 18

*Ganske v. WRS Grp., Inc.*,
  2007 WL 1147357 (Tex. App. Apr. 18, 2007) .....................................................20

*In re Google Play Store Antitrust Litig.*,
  2024 WL 3302068 (N.D. Cal. July 3, 2024)..........................................................12

*Government Employees Health Ass'n. v. Actelion Pharms Ltd.*,
  2024 WL 4123511 (D. Md. Sept. 6, 2024) ............................................................19

*Heatransfer Corp. v. Volkswagenwerk, A.G.*,
  553 F.2d 964 (5th Cir. 1977) .................................................................................7

*IBM Corp. v. LzLabs GmbH*,
  2023 WL 11916812 (W.D. Tex. Mar. 24, 2023) ..................................................5, 6

*IL Ventures v. Factory 14 UK Acquisition VI*,
  2023 WL 9111897 (W.D. Tex. Dec. 20, 2023) .....................................................20

*Impax Labs, Inc. v. F.T.C.*,
  994 F.3d 484 (5th Cir. 2021) .................................................................................7

*Jones v. Cain*,
  600 F.3d 527 (5th Cir. 2010) .................................................................................8

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019)................................................................9, 13

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) ....................................................................8, 15, 16

*Medtronic AVE, Inc. v. Cordis Corp.*,
  2004 WL 7322043 (E.D. Tex. Mar. 18, 2024) ......................................9, 14, 16, 17

*Mid-Texas Commc'ns Sys., Inc. v. A.T.&T. Co.*,
  615 F.2d 1372 (5th Cir. 1980) ............................................................................7, 8

*Pacific Bell Telephone Co. v. linkLine Commc'ns Corp.*,
    555 U.S. 438 (2009)................................................................10, 18

*Poster Exchange, Inc. v. National Screen Serv. Corp.*,
    517 F.2d 117 (5th Cir. 1975) ...................................................5

*Potters Md. Ctr. v. City Hosp. Ass'n*,
    800 F.2d 568 (6th Cir. 1986) ...................................................11

*Pulse Network, L.L.C. v. Visa, Inc.*,
    30 F.4th 480 (5th Cir. 2022) ....................................................6

*Response of Carolina, Inc. v. Leasco Response, Inc.*,
    537 F.2d 1307 (5th Cir. 1976) .................................................13

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
    2013 WL 5366104 (E.D. Tex. Mar. 14, 2013) .....................14, 16

*Sanchez v. Gomez*,
    2017 WL 3842137 (W.D. Tex. Sept. 1, 2017).............................8

*Shamrock Mktg, Inc. v. Bridgestone Bandag, LLC*,
    775 F. Supp. 2d 972 (W.D. Ky. 2011) ...............................17, 18

*Shepherd v. Wells Fargo Bank*,
    2016 WL 4435267 (W.D. Tex. Aug. 19, 2016).........................20

*Shields v. Bradberry*,
    526 S.W.3d 471 (Tex. 2017).....................................................20

*Sidibe v. Sutter Health*,
    103 F.4th 675 (9th Cir. 2024) .................................................12

*Smith v. eBay Corp.*,
    2012 WL 27718 (N.D. Cal. Jan. 5, 2012) ................................17

*In re Surescripts Antitrust Litig.*,
    608 F. Supp. 3d 629 (N.D. Ill. 2022) ................................14, 15

*FTC v. Syngenta Crop. Prot. AG*,
    11 F. Supp. 3d 545 (M.D.N.C. 2024) ...............................14, 15

*Taylor Publ'g. Co. v. Jostens, Inc.*,
    216 F.3d 465 (5th Cir. 2000) ....................................................7

*Texas Grain Storage, Inc. v. Monsanto Co.*,
    2008 WL 2570530 (W.D. Tex. June 26, 2008) ..........................5

*United States v. Dentsply, International, Inc.*,
  399 F.3d 181 (3d Cir. 2005).............................................................................12, 15

*United States v. Google LLC*,
  2024 WL 367498 (D.D.C. Aug. 5, 2024) ......................................................... *passim*

*United States. v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) .............................................................8, 10, 12, 15

*Universal Hospital Servs., Inc. v. Hill-Rom Holdings, Inc.*,
  2015 WL 6994438 (W.D. Tex. Oct. 15, 2015) ............................................. *passim*

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ......................................................................18

*Virgin Atlantic Airways Ltd. v. British Airways PLC*,
  257 F.3d 256 (2d Cir. 2001)........................................................................14

*In re Wellbutrin XL Antitrust. Litig.*,
  868 F.3d 132 (3d Cir. 2017)..........................................................................6

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)...........................................................9, 11, 14, 15

Across seventy pages of detailed allegations, ClearCorrect explains exactly how Align unlawfully maintains its Invisalign monopoly, and how even though ClearCorrect markets a better clear aligner solution, it cannot make meaningful inroads in the market—regardless of the features it develops, how well it promotes or how low it sets its price—because Align has used its monopoly power to force doctors to sell Invisalign on a near-exclusive basis. Align, in fact, brags that it has created a "competitive moat" around Invisalign, imposing conditions on doctors that drive the "right behavior"—loyalty. Yet, in response to ClearCorrect's well pleaded allegations, Align resorts to misstating the law, improperly arguing the facts, and distorting ClearCorrect's claims.

Align's motion to dismiss opens with a statute of limitations argument that is foreclosed by a half century of Fifth Circuit precedent. Align follows that with the absurd proposition that the antitrust claims should be dismissed simply because Align *alleges* ClearCorrect infringes its patents. When it finally addresses the substance, Align floods the Court with disputed facts—asking the Court to embrace pretextual justifications and misleading characterizations, and even to draw conclusions about industry economics based on hearsay about a *single dental practice*. On top of that, Align all but ignores the central exclusive dealing allegations, not to mention the wealth of precedent making clear those allegations alone state a claim for monopolization.

Throughout, Align repeatedly implies that the Court should dismiss the antitrust claims here because Align was purportedly "successful" in defeating prior antitrust claims. But it is unclear how much "success" Align has had in these prior cases. Of the three prior antitrust claims, Align settled one, is trying to settle a second,[1] the third is ongoing, and *none* were dismissed at the pleading stage. And while a California district court recently granted summary judgment in

---

[1] A court recently denied a proposed settlement, expressing concerns that the settlement itself was anticompetitive. *Snow v. Align Tech.*, No. 21-cv-03269-VC, Dkt. 624, at 1 (N.D. Cal. Sept. 18, 2024) (noting settlement would unfairly aid Align, "the dominant player in the aligner market").

Align's favor in that third case (on an issue that is at best tangential here), the Department of Justice has since taken the extraordinary step of intervening to explain to the Ninth Circuit that the district court misapplied antitrust law.[2] Regardless, none of those cases involved allegations by an injured clear aligner competitor, let alone allegations as extensive as those in ClearCorrect's Counterclaims. And, of course, none of those cases is binding on ClearCorrect or this Court.

## BACKGROUND

In the face of nascent competition, Align implemented and maintains to this day an anticompetitive scheme of *de facto* exclusive dealing with doctors that prevents any competitor from challenging Align's Invisalign monopoly. Because doctors are the primary channels of distribution for aligners, Align's scheme is centered around restraining their ability to order and recommend competing aligners. CC ¶¶ 19, 127, 149. This scheme locks doctors into Invisalign, locks competitors out, and enables Align to continue to charge monopoly prices. CC ¶ 2.

The *de facto* exclusive dealing Align continues to impose on doctors, which cements the Invisalign monopoly, is set up by an equally anticompetitive tying scheme Align employed to create a dominant base of intraoral scanners. CC ¶¶ 63-83. Over the past decade, intraoral scans have become the predominant means of obtaining the dental impressions necessary to make clear aligners, rendering almost entirely obsolete the more burdensome, time-consuming, and uncomfortable polyvinyl siloxane ("PVS") molds. CC ¶¶ 49, 174. Before Align faced the potential for significant clear aligner competition, it profitably accepted scans from third-party scanners. CC ¶¶ 67-68, 75. That policy abruptly changed when Align anticipated more Invisalign competition. CC ¶¶ 69-78. Align understood that it could use its own scanner, the iTero, to build what it called a "competitive moat" around Invisalign. *E.g.*, CC ¶ 83. It decided that if doctors

---

[2] *Simon & Simon, PC v. Align Technology, Inc.*, No. 24-1703, Dkt. 56 (9th Cir. Aug. 30, 2024), available at https://www.justice.gov/atr/media/1367196/dl ("DOJ *Amicus*").

wanted access to Invisalign (which most doctors do given Invisalign's dominance, (CC ¶¶ 16, 146), those doctors needed to use the iTero—thus tying the dominant Invisalign clear aligners to the iTero scanner.  There is no legitimate justification for this change in policy.

The iTero "moat" allowed Align more effectively to impose *de facto* exclusive dealing conditions on doctors through contractual restraints, technical impediments, and financial penalties.  Align admits that it enters agreements with doctors as well as dental and orthodontic service organizations (DSOs and OSOs) requiring them to "promote only Invisalign." CC ¶¶ 119-129.  For example, certain iTero purchase agreements require doctors to maintain "good standing" with Invisalign, which requires they not "divert patients who are prospective patients for Invisalign to other non-Invisalign treatments." CC ¶¶ 120-22. This "good standing" requirement is pervasive;

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

Align also imposes technical impediments that make it extremely difficult and time consuming for doctors to use the iTero to order competing aligners—making the iTero itself a barrier to competing aligner companies.  *See* CC ¶¶ 84-100. [3]  For doctors with iTeros to purchase competing aligners, they must go through an intentionally difficult multistep process to download the file from Align's website, which can take over 48 hours, CC ¶ 89, and which often results in corrupted or unusable files.  CC ¶¶ 92-95.  In an industry where speed of "workflow" is central to profitability, this unjustified technological barrier raises the costs to doctors to use alternatives, ensuring competitors cannot compete on the level playing field the antitrust laws demand.  *Id.*

---

[3] High capital costs and subscription and training costs make doctors unlikely to own more than one brand of scanner.  CC ¶ 99.  The life span of the iTero is at least five-years.  CC ¶ 108.

Align further penalizes doctors for the use of competing aligners through two methods: (1) it provides a "discount" on the iTero—a scanner that is more than twice as expensive as other scanners—if the doctor commits to sending an increasing stream of cases to Invisalign, and (2) it provides a "discount" on Invisalign—an aligner that is substantially more expensive than ClearCorrect—only if doctors, once again, send an ever increasing stream of Invisalign cases to Align. CC ¶¶ 102-118. These minimum case requirements feed into one another to require that doctors must sell Invisalign to afford their iTero and must sell vast quantities of Invisalign to avoid exorbitant penalty prices. Doctors then feel economic pressure to be listed on Align's "Find a Doctor" tool to achieve these minimums, which in turn, requires "good standing"—that is, a commitment to promote only Invisalign. CC ¶ 122. Align itself brags to investors that these minimum case commitments ensure "customer stickiness," "drive[] the right behavior," and compel doctors to "rely almost exclusively on [Align's] product lines," CC ¶ 116, thus *admitting* to the *de facto* exclusive dealing at the heart of the antitrust counterclaims.

The Counterclaims provide extensive detail on how Align's practices operate together to foreclose competition. CC ¶¶ 134-150. Even putting aside the contractual restraints preventing doctors from even *recommending* a competing aligner, a competing aligner company would need to overcome both the added burdens and costs imposed by the iTero technical barriers and the exorbitant financial penalties Align imposes on doctors that are "disloyal." CC ¶¶ 143-148. This is a classic, and effective, monopolistic scheme *that continues to this day*.

## ARGUMENT

### A. The Antitrust Counterclaims Are Not Time Barred

Align's statute of limitations argument runs contrary to clear Fifth Circuit precedent. Align focuses on alleged conduct from 2017 (when it began tying Invisalign to the iTero), 2018 (when it signed its initial contract with Heartland), and 2019 (when its minimum case commitment pricing

programs purportedly become known). Br. at 6-7. But fifty years ago, the Fifth Circuit "la[id] to rest the theory that . . . a continued antitrust violation must be prosecuted within four years from the *first* act of illegality." *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 126-27 (5th Cir. 1975). The rule in the Fifth Circuit remains that "an antitrust cause of action accrues *each time* a defendant commits an act that injures plaintiff," and that rule applies "to all types of anticompetitive behavior." *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1186-87 (5th Cir. 1988). Thus, where, as here, there is an *ongoing* monopolistic scheme, it does not matter if the monopolist started its illegal acts more than four years before the filing of the antitrust claim.

To survive a motion to dismiss, a plaintiff need only plausibly allege that the defendant has engaged in "some" "'monopolistic' conduct *during* the limitations period." *Texas Grain Storage, Inc. v. Monsanto Co.*, 2008 WL 2570530, at *5-6 (W.D. Tex. June 26, 2008) (citing allegations on ongoing exclusive dealing conduct during limitations period); *see also IBM Corp. v. LzLabs GmbH*, 2023 WL 11916812, at *4 n.1 (W.D. Tex. Mar. 24, 2023) (that "anticompetitive policy started" before limitations period did not bar claim). The Counterclaims plainly do so, explaining how *on an ongoing basis*, Align reasserts its lock-in grip on doctors by continuing to coerce them into purchasing iTeros, continuing to impose *de facto* exclusivity by renewing contractual restraints and minimum case requirements, and continuing to erect technical impediments and other barriers to entry for competing clear aligners. *See infra*. Align simply ignores the clearly alleged, ongoing nature of its scheme. Tellingly, a centerpiece of Align's argument—the 2018 exclusionary contract with Heartland—was itself *renewed in 2023*. CC ¶ 81.[4]

---

[4] *Chandler v. Phx Servs, L.L.C.*, 45 F.4th 807 (5th Cir. 2022), cited by Align, did not involve an ongoing scheme. One exception to the continuing violation rule is if the conduct during the limitations period is "nothing more than the 'unabated inertial consequences of some pre-limitation action.'" *Texas Grain*, 2008 WL 2570530, at *6. Align does not make that argument, nor could it.

**B.      Align's Patent Assertions Do Not Negate ClearCorrect's Antitrust Injury**

Align cannot avoid antitrust scrutiny simply by alleging that ClearCorrect infringes.  Br. at 8.  The lost profits of a foreclosed competitor are a "textbook antitrust injury."  *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 491 (5th Cir. 2022).  And although Align ***claims*** infringement, "patent infringement is not a defense against antitrust standing and injury."  *Arisa Networks, Inc. v. Cisco Sys., Inc.*, 2018 WL 11606358, *10 (N.D. Cal. Feb. 14, 2018).[5]  After all, infringement does not "strip[] . . . [a] seller's status as a market participant."  *Id.* at *7 (explaining infringement often results in royalties not injunctions).  Further, public policy favoring rigorous antitrust enforcement means that Align cannot defend anticompetitive conduct by claiming the victim also acted improperly.  *Id.* at *5 ("illegality" and "unlawful market presence" not antitrust defenses); *10 (holding "each party [the alleged monopolist and alleged infringer] could resort to remedies based on the available cause of action").  Finally, even if infringement were a defense, the Court cannot adjudicate it now based on Align's mere allegations, especially when ClearCorrect has denied them in the pleading at issue.  *See, e.g.,* CC at 3; *Arista Networks, Inc. v. Cisco Sys., Inc.*, 2017 WL 6102804, at *5-7 (N.D. Cal. Oct. 10, 2017) (rejecting "premise" of antitrust injury defense on motion to dismiss, declining to "accept as true that Arista infringed Cisco's patents").

**C.      The Antitrust Counterclaims Allege Actionable Monopolistic Conduct**

"A defendant is liable for monopolization under Section 2 when it (1) possesses monopoly power and (2) achieves or maintains its monopoly power through anticompetitive conduct."  *IBM*, 2023 WL 11916812, at *2.  Align does not challenge the monopoly power allegations.  It focuses

---

[5] In *In re Wellbutrin XL Antitrust. Litig.*, 868 F.3d 132 (3d Cir. 2017), Br. at 8, the court found that the challenged agreement did not delay generic competition because the plaintiff did not show the generic would have entered the market earlier but-for the agreement.  *Id.* at 165.  The same is true for the other cases Align cites (n.14).  Here, ClearCorrect is already on the market.  *Arista*, 2018 WL 11606358, at *9 ("Those cases do not address the issue of whether a patent infringer who is actually participating in the market is precluded from brining an antitrust suit").

only on the anticompetitive conduct element, but even when Align reaches beyond the pleadings to argue contrary facts, it still only addresses a fraction of the conduct alleged—specifically, the anticompetitive tie Align used to coerce doctors into purchasing the iTero. Align virtually ignores the core of ClearCorrect's allegations as an injured clear aligner competitor—the *de facto* exclusivity Align imposes on doctors—even though the Counterclaims repeatedly emphasize this exclusivity. *E.g.*, CC ¶¶ 5-6, 10, 18, 20, 84-133, 144-150, 177-179. This omission is indefensible and dispositive. Even if Align could show that its coercive efforts to force the iTero on doctors did not themselves violate the antitrust laws (which Align cannot show), the *de facto* exclusivity Align imposes on those doctors remains a sufficient basis for Section 2 liability ***on its own***.

1.    **The *De Facto* Exclusivity Allegations Alone Constitute Exclusionary Conduct**

As the Fifth Circuit explains, Section 2 of the Sherman Act prohibits "conduct designed to barricade access to markets." *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 981 (5th Cir. 1977). Anticompetitive conduct is conduct that (1) "tends to impair the opportunities of rivals" and (2) "either does not further competition" or (3) "does so in an unnecessarily restrictive way." *Taylor Publ'g. Co. v. Jostens, Inc.*, 216 F.3d 465, 477 (5th Cir. 2000). Determining whether conduct is anticompetitive under Section 2 involves a burden-shifting framework like the "rule of reason" employed for Section 1 (restraint of trade) cases—the initial burden is on the plaintiff to show conduct is anticompetitive, and the burden is then shifted to the defendant to offer a procompetitive justification ***as a defense***. *Mid-Texas Commc'ns Sys., Inc. v. A.T.&T. Co.*, 615 F.2d 1372, 1389 n.13 (5th Cir. 1980).[6] In fact, the D.C. Circuit's landmark monopolization decision in *Microsoft* grounded its use of that burden-shifting framework in part on Fifth Circuit

---

[6] If a defendant proves a procompetitive justification, the plaintiff will prevail if it can show "a less restrictive alternative way to achieve the procompetitive benefits" or that the anticompetitive effects outweigh the benefits. *Impax Labs, Inc. v. F.T.C.*, 994 F.3d 484, 492 (5th Cir. 2021).

precedent. *U.S. v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) (relying on *Mid-Texas*). *Microsoft*'s "'rule of reason'-style" framework is how courts evaluate exclusive dealing claims. *See, e.g.*, *McWane, Inc. v. FTC*, 783 F.3d 814, 833 (11th Cir. 2015); *United States v. Google LLC* ("*Google*"), 2024 WL 367498, at *98 (D.D.C. Aug. 5, 2024). To plead anticompetitive conduct, ClearCorrect must allege facts which plausibly show (a) that Align imposes exclusive dealing conditions on doctors and (b) the aggregate effect of that exclusivity results in "substantial market foreclosure" in the relevant market. *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, 2015 WL 6994438, at *14 (W.D. Tex. Oct. 15, 2015). The Counterclaims easily clear this hurdle.[7]

### a. The Counterclaims Allege *De Facto* Exclusive Dealing

Align addresses the exclusive nature of its dealing with doctors in just a single paragraph. Br. at 14. In that paragraph, it references **one** DSO contract that it purports leaves doctors **technically** free to sell competing aligners, identifies **one dental practice** in Los Angeles which purportedly has sold a competing aligner, declares in a single sentence that "loyalty" programs "promote competition" without disclosing the relevant legal framework, and then asserts—again in a single sentence and without citation to any authority—that "anti-steering" provisions do not create exclusivity. The Court should deem these arguments waived, *E.R. v. Jasso*, 573 F. Supp. 3d 1117, 1136 n. 137 (W.D. Tex. 2021) ("It is not sufficient for a party to mention a possible argument in a skeletal way."); *Sanchez v. Gomez*, 2017 WL 3842137, *6 (W.D. Tex. Sept. 1, 2017) (rejecting defendant's "spaghetti-on-the-wall approach"), especially because Align cannot present new arguments for the first time on reply, *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010). In any event, three well-established principles of exclusive dealing law dispose of Align's arguments.

---

[7] Whether Align can offer a non-pretextual procompetitive justification as a defense is not something that can or should be decided on this motion to dismiss. *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 524 (W.D. La. 2016).

***First***, exclusive dealing need not come in the form of an "express exclusivity requirement"; liability can arise from *de facto* exclusivity based on the practical effect of the monopolist's policies and conduct. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) (explaining that courts "look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement 'in the real world.'"). It therefore does not matter whether doctors are expressly prohibited from selling a competing aligner. *Medtronic AVE, Inc. v. Cordis Corp.*, 2004 WL 7322043, *4 (E.D. Tex. Mar. 18, 2024) (*de facto* exclusive dealing because sales terms effectively meant purchasers "could not deal in the goods of another").

***Second***, liability for exclusive dealing never requires *complete* foreclosure; instead, the "legality of such an arrangement ultimately depends on whether the agreement foreclosed a substantial share of the relevant market such that competition was harmed." *ZF Meritor*, 696 F.3d at 283 (holding "an agreement does not need to be 100% exclusive in order to meet the legal requirements of exclusive dealing"). Accordingly, the selling practices of a single dentist are plainly not dispositive. *See Google*, 2024 WL 3647498, at *101 (fact that "small fraction" of users ultimately used competing search engine "does not render [Google's] browser agreements [with OEMs] non-exclusive"). Further, the "extent to which competitors were excluded" by a scheme "is fact-dependent and not properly disposed of on a motion to dismiss." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 236 (S.D.N.Y. 2019).

***Finally***, the Court must evaluate the exclusive dealing allegations by considering the "collective[]" effect of all facets of Align's dealings as a whole. *See Universal Hosp.*, 2015 WL 6994438 at *6 (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (holding that "character and effect" of anticompetitive scheme must not "be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole")). Thus, while

each of the components of Align's exclusive dealing scheme is separately anticompetitive, it is the combined effect that should be evaluated. *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1356 (5th Cir. 1980). After all, it is always "the mix of the various ingredients of . . . behavior in a monopoly broth that produces the unsavory flavor." *City of Mishawaka v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980).[8]

*Microsoft* not only provides the governing framework, but is also factually analogous because it also involved a multifaceted monopolization scheme involving the interplay of two related markets—the operating system market (dominated by Microsoft's Windows) and an internet browser market (where Microsoft's Explorer competed with Netscape's Navigator). 253 F.3d at 47. Microsoft feared that the Netscape browser would provide an alternative platform for software applications which would, in turn, undercut its existing operating system monopoly. *Id.* at 50. Thus, like here, Microsoft tied Windows and Explorer together (requiring computer OEMs that wanted Windows to also license and load Explorer), and then leveraged its monopoly power to impose *de facto* exclusivity upon OEMs and internet access providers ("IAPs") through a combination of contractual provisions that prevented OEMs and IAPs from "promoting rival browsers," and by creating unjustified technical barriers to remove Explorer from desktops and to load Netscape instead or in addition. *Id.* at 61-62. Align followed a similar playbook.

***Align's Exclusive Promotion Provisions***. Requiring retailers and distributors (here doctors) to promote only the monopolist's product, or not to promote an alternative—as Align has done—is a textbook feature of *de facto* exclusive dealing. *See Microsoft*, 253 F.3d at 62 ("The

---

[8] Align's argument that *Pac. Bell Tele. Co. v. linkLine Commc'ns Corp.*, 555 U.S. 438 (2009) somehow counsels against viewing a monopolistic scheme as a whole has been soundly and correctly rejected in this District. *Universal Hosp.*, 2015 WL 6994438 at *6 (explaining that "the principles set forth in *linkLine* have been limited to 'price squeeze' cases" and citing authority).

anticompetitive effect of the license restrictions is … that OEMs are not able to promote rival browsers…”); *Google*, 2024 WL 3647498 at *102 (*de facto* exclusivity achieved in part through distributor agreements that “greatly restrict a partner’s ability to promote other [general search engines]”). Like here, such restrictions are often combined with minimum sales requirements.[9] *ZF Meritor*, 696 F.3d at 265 (*de facto* exclusive dealing tied pricing to minimum volume and required distributor “to remove competitors’ products” from its sales catalogues).

Align does not dispute the existence of these pervasive exclusive promotion or “anti-steering” provisions in its contracts with doctors and DSOs and OSOs; instead, ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████ Dkt. 96-1 §§ 11, 13; *ZF Meritor*, 696 F.3d at 278 (finding exclusive dealing where failure to adhere to terms of agreement would “jeopardize” relationship with monopolist); *Potters Md. Ctr. v. City Hosp. Ass’n*, 800 F.2d 568, 576-77, 580 (6th Cir. 1986) (assertion of physicians’ “freedom” no antitrust defense where restrictive terms can “interfere with the independence of physician decisions”). While monopolists routinely try to defend *de facto* exclusive dealing claims by promising competition remains ***possible***, “market realities matter more than what is theoretically possible.” *Google*, 2024 WL 3647498 at *100. Exclusive promotion and anti-steering provisions “insulate [monopolists] from price competition by preventing [sellers] from ‘steering’ [customers] away from [the monopolist] and toward lower-priced providers.”

---

[9] Even the mere presence of these restrictions, combined with Align’s notoriously litigious nature, can produce exclusivity. *Advanced Bus. Sys. & Supply Co. v. SCM Corp.*, 415 F.2d 55, 64 (4th Cir. 1969) (“The fact that an agreement is leniently administered, however, does not necessarily lessen, and certainly does not eliminate, its restrictive effect on competition. The threat of enforcement is ever present[.]”).

*Sidibe v. Sutter Health*, 103 F.4th 675, 690 (9th Cir. 2024); *In re Google Play Store Antitrust Litig.*, 2024 WL 3302068, at *12 (N.D. Cal. July 3, 2024) (evidence supported verdict that "anti-steering restrictions" contributed to monopolization). Indeed, the importance of doctor recommendations to patients means restrictions on doctor recommendations are often treated as tantamount to express exclusivity. *Colucci v. Health First, Inc.*, 2021 WL 4304742, at *3 (M.D. Fla. Aug. 12, 2021) (exclusive dealing where physicians required to refer patients exclusively to defendant).[10]

       ***iTero's Technical Barrier to Competing Aligners***. *De facto* exclusive dealing is often imposed through technical hurdles—such as those Align imposes on doctors through the iTero—that prevent, complicate, or otherwise discourage the use of rival products. *See Microsoft*, 253 F.3d at 64 (explaining how Microsoft supplemented "contractual restrictions" with technical restrictions in product design that made it difficult for OEMs and end users to remove Microsoft's browser or even add a second browser); *Google Play*, 2024 WL 3302068, at *11 (monopolization scheme involving technical restrictions that created "friction" when trying to use competitor products). Here, Align simply wrestles against the well-pleaded facts in a way that is improper on a motion to dismiss—downplaying what it characterizes as the mere "inconvenience" of exporting files from the iTero, and bringing in facts beyond the pleadings to urge that using the iTero to order competing aligners is ***possible***. Br. at 10-11. The Counterclaims are clear that the iTero imposes

---

[10] Align cryptically argues that exclusive dealing, at least under a DSO contract, would *also* violate "numerous state laws, including those of Texas, that prohibit corporate entities from practicing medicine." Br. at 4, n. 8. But, even if so, the fact that Align's conduct may independently violate other laws is no panacea. Align's further suggestion that the "decision to purchase treatment is still up to the patient," Br. 11, ignores the allegations that Align's conduct prohibits doctors from "offer[ing] choice to their customer" and that explain that in this market, where consumers rely on advice from medical professionals, the ability to work with doctors is "key to effective competition." CC ¶¶ 19, 149. The inability of doctors to offer alternative aligners "limit[s]" consumer choice because doctors cannot "heed a request for a different manufacturer's product." *United States v. Dentsply, Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005).

such a burden on doctors that it substantially deters the use of competitor products, especially given the importance of speed of workflow for doctors' profitability. CC ¶¶ 84-100. In *Google*, for example, *de facto* exclusivity was established in part on technical hurdles that created what the court referred to as "choice friction" that minimized switching (despite evidence that a minimal amount of switching nonetheless occurred). 2024 WL 367498, at *15-17, 110. Indeed, courts routinely consider allegations of "anticompetitive product design" in conjunction with other conduct (as here) where "the overall effect of which is to coerce customers" to purchase the monopolist's product. *Keurig*, 383 F. Supp. 3d at 230.

Align misleadingly discusses "the benefits" and "simplicity" of "Align's digital workflow," Br. at 10-11, but that is sleight of hand. The issue is not how "simple" it is to order Invisalign, but rather how burdensome Align makes it to order competing aligners. And while a defendant can **defend** a technical barrier to competition with evidence that the design "achieves some technologically beneficial result," *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307 (5th Cir. 1976), that is a fact-intensive inquiry that cannot be decided on this motion. Where, as here, the product (iTero) is **forced** upon the market by coercion rather than choice, the deference antitrust courts afford to product design is lost, and courts must balance the proposed benefits against the anticompetitive effects. *Abbott Lab'ys v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 421 (D. Del. 2006) (holding that when "a monopolist prevents consumer choice, greater scrutiny [of anticompetitive facets of product design] is appropriate").

**Align's Loyalty Pricing Schemes**. A monopolist can achieve *de facto* exclusivity through so-called "loyalty" schemes—as Align does—where pricing turns on volume commitments (or, in this case, where penalties are imposed for missing commitments). *See Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 228-29 (D.D.C. 2022) (20% discount if buyer purchased

90% of requirements found to be *de facto* exclusive dealing); *ZF Meritor*, 696 F.3d at 282-84 (similar). Courts in this Circuit have routinely found these loyalty schemes can amount to exclusive dealing. *Universal Hosp.*, 2015 WL 6994438, at *16; *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 2013 WL 5366104, at *2 (E.D. Tex. Mar. 14, 2013); *Medtronic*, 2004 WL 7322043, at *4. The anticompetitive effects of these schemes are well-known: if a firm with existing monopoly power threatens significantly higher pricing if the purchaser does not achieve high degrees of "loyalty," that creates a barrier to emerging competition. *FTC v. Syngenta Crop. Prot. AG*, 11 F. Supp. 3d 545, 577 (M.D.N.C. 2024) ("Plaintiffs have plausibly alleged that the Defendants' use of the loyalty discounts . . . exacerbates the already high costs to enter the market by locking up access to the most efficient channel of distribution").

Align downplays these as mere "voluntary discounts," Br. at 10, but the allegations in the Counterclaims set forth their anticompetitive effect.[11] They are not "discounts"; they are supracompetitive prices that are merely lower than the even more supracompetitive prices that would be imposed on disloyal customers. *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 647 (N.D. Ill. 2022) ("[T]he loyalty prices are supracompetitive and are better only than the even-higher supracompetitive prices Surescripts can impose (given its monopoly power) on any pharmacy who declines the loyalty rate."). The size of the penalty and the volume needed to avoid it (combined with the rest of Align's scheme) effectively mean that the doctor will suffer a "net loss" if it gives ***any meaningful business*** to ClearCorrect, even if ClearCorrect offers a better product at a lower price. *Id.* at 646 ("Surescripts' loyalty scheme may create a net detriment for

---

[11] *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256 (2d Cir. 2001), Br. at 14, does not help Align. The holding that the discounts offered in that case "promote[d] competition" was a ***factual*** conclusion, based on the ***summary judgment record***, where the plaintiff failed to demonstrate the exclusionary nature of the scheme, which ClearCorrect alleges, CC ¶¶ 142-150.

any individual pharmacy that accepts the competitor's better offer."). Align itself has acknowledged that its "discounts" are ***not*** intended to compete on price but instead to ensure customer "stickiness" and that doctors "rely almost exclusively" on Invisalign. CC ¶¶ 116, 153.[12]

### b. Align's Conduct Substantially Forecloses Competition

Substantial foreclosure is established where the "opportunities for other traders to enter into or remain in that market" are "significantly limited." *Microsoft*, 253 F.3d at 69. Courts consider qualitative and quantitative factors bearing on whether competition has been hindered, *Universal Hosp.*, 2015 WL 6994438, at *14, and evaluate the challenged conduct in the aggregate, *Google*, 2024 WL 3647498, at *107. Align does not even confront, let alone refute, ClearCorrect's allegations of substantial foreclosure.[13] Align instead misleadingly claims that ClearCorrect has pointed to "at most nine [DSO] agreements." Br. 15. First, ClearCorrect was not required to

---

[12] Align does not contend that ClearCorrect must allege that the discounts amount to below-cost pricing, nor could it because—by Align's own admission—the scheme operates to penalize disloyalty and dissuade switching. *See Am. President*, 633 F. Supp. 3d at 229; *Surescripts*, 608 F. Supp. 3d at 642-43. This is particularly true where, as here, there are "mechanisms beyond price-cutting that exclude competition by imposing unilateral costs on competitors." *Syngenta*, 711 F. Supp. 3d at 575. Align also uses the iTero to monitor doctors' orders, and these doctors not only face technical impediments, but enforcement of restrictive contractual conditions and risk of losing access to Invisalign, CC ¶¶ 130-133, which together establish *de facto* exclusive dealing. *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1171-72 (10th Cir. 2023).

[13] ClearCorrect has sufficiently alleged the qualitative factors bearing on substantial foreclosure. *Universal Hosp.*, 2015 WL 6994438, at *14. Doctors are locked-in to purchasing Invisalign for the iTero's lifespan (five years), enter into long-term discount programs (three years), and DSOs and OSOs have entered into multiyear contracts (at least three years). CC ¶¶ 102, 108; *see ZF Meritor*, 696 F.3d at 286-87 (exclusive agreements longer than one year raise antitrust concerns). Given the length of treatment and the design of Align's scheme, doctors are further compelled to purchase new iterations of the iTero to continue servicing their ongoing cases and to access Invisalign. CC ¶¶ 108, 114. Even Align's so-called "voluntary discounts" are long-term exclusive arrangements that even if terminable with "legal ease," come with "strong economic incentive[s]" that foreclose using alternatives and penalize switching. *Dentsply*, 399 F.3d at 193-94; *see also McWane*, 783 F.3d at 834-35. Moreover, Align's scheme relegates ClearCorrect to substantially less efficient means of competing for the cases that each orthodontist and dentist caught in Align's scheme respectively complete in a year, CC ¶ 51 & n.17, and prevents ClearCorrect from developing relationships with doctors that would allow it to effectively compete. CC ¶ 149.

"plead specific percentages of market foreclosure." *Retractable*, 2011 WL 13134434, at *8.

Second, Align ignores that ClearCorrect's allegations are not limited to DSO agreements and

instead extend to Align's design of the iTero, its contracts with individual doctors, and its loyalty

schemes, which in aggregate result in ***more than*** 60% foreclosure. CC ¶¶ 20, 178, 226; *McWane*,

783 F.3d at 837 (40% foreclosure more than sufficient in Section 2 case).

Align next misleadingly claims ClearCorrect has not alleged that it was deprived of scale

needed to compete, Br. 15, but Align cites no case that requires showing deprivation of scale, as

opposed to harm to competition more generally. *See McWane*, 783 F.3d at 838-89 (explaining that

the "most powerful evidence of anticompetitive harm" from foreclosure is "supracompetitive

prices"); CC ¶¶ 151, 173. Regardless, ClearCorrect plainly alleges that because of Align's

foreclosure, it achieved "fewer cost efficiencies of scale" than it would have, that absent the

foreclosure, ClearCorrect "would have been able to scale," CC ¶¶ 150, 171, 182, and that Align's

CEO has stated that scale is critical in the clear aligner market. CC ¶ 171.

### 2. Align's Invisalign-iTero Tie Is Anticompetitive

These contracts, costs, and technical issues that come with the iTero play a key role in the

"competitive moat" Align dug around Invisalign. It is therefore even more damning that the way

Align created and maintains its dominant installed base of scanners was itself anticompetitive.

Align forces an overpriced iTero on doctors through anticompetitive tying between Invisalign (the

tying product) and the iTero (the tied product). Again, Align simply wrestles against the facts.[14]

Align stresses that there is no allegation that it expressly conditions access to Invisalign on

the purchase of an iTero, Br. at 10, but the law does not require express conditioning. *Medtronic*,

---

[14] Align does not refute that the Counterclaims adequately allege each element of a tying claim beyond the tie itself—that it involves separate products, sufficient power in the tying market, "a not insubstantial" amount of commerce in the tied market, and anticompetitive effects. *Chatham Condominium Ass'ns. v. Century Village, Inc.*, 597 F.2d 1002, 1008 n.8 (5th Cir. 1979).

16

2004 WL 7322043, at *3 (tying "need not be express").  As Align's own cited authority explains, a tie may be inferred where, as here, "circumstances surrounding the transaction as a practical matter force the buyer into purchasing the tied product" or where a "seller's policy" makes the "purchasing of the tying and tied products together the only viable economic option" given market conditions.  *Id.; Shamrock Mktg, Inc. v. Bridgestone Bandag, LLC*, 775 F. Supp. 2d 972, 980-81 (W.D. Ky. 2011) ("[C]ourts have found tying arrangements where the buyer's only economically viable option is to purchase both the tying and the tied product.") (citing cases).

Align next argues—***without any citation to any authority***—that because doctors previously used PVS frequently to order Invisalign (prior to 2016, purportedly) and *can* still technically use it now (albeit infrequently), the Invisalign-iTero tie cannot be actionable.  Br. at 10.  Not only does Align inject facts beyond the pleading, but it is again wrong as matter of law. ClearCorrect has alleged **in detail** why PVS impressions are no longer viable alternatives in the marketplace.  CC ¶¶ 49, 17.[15]  The fact that the only other way to purchase Invisalign is the unreasonably difficult, costly, and archaic option of using PVS, is sufficient to establish tying. *Smith v. eBay Corp.*, 2012 WL 27718, at *6 (N.D. Cal. Jan. 5, 2012) (finding tying adequately alleged where complaint explained why alternatives to tied product "are not viable alternatives"); *see also Fotobom Media, Inc. v. Google LLC*, 2024 WL 1603968, at *10 (D.D.C. Feb. 27, 2024) (finding implicit tie where alternative to accessing tying products without accepting tied product was "too burdensome" and "unreasonably difficult").  Nor does it matter that some, few doctors still use PVS.  ClearCorrect does not need to show that **every** buyer that wants to purchase

---

[15] Align points to external evidence noting that more than 50% of its sales of clear aligners were sourced from an iTero in 2016.  The Court should not consider that evidence.  Regardless, this number has drastically expanded to 95% of Invisalign's orders being placed using iTero.  CC ¶ 174.  What may have been economically rational eight years ago, CC ¶ 65, is hardly reflective of economically rational behavior today or even a few years later.

Invisalign also purchases an iTero, but instead that "many, if not all, rational buyers" buy the tied products. *Shamrock Mkting*, 775 F. Supp. 2d at 980-81; *see Fotobom*, 2024 WL 1603968, at *11.

Finally, Align's "refusal to deal" arguments, Br. at 12-13, are a red herring. The *Aspen Skiing* framework applies only to Align's refusals "to deal with ***its rivals***." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (emphasis added); *Verizon Commc'ns*, 540 U.S. 398, 410 (2004). Align's termination of 3Shape was a mere prelude to its tying policy, which is aimed at Align's ***customers***. As the Tenth Circuit explained, the *Aspen Skiing* standard does not apply to a monopolist's conduct that threatens to not deal with ***customers*** unless those customers accept anticompetitive conditions. *Chase*, 84 F.4th at 1173; *see also Dinosaur Fin. Grp. LLC v. S&P Global, Inc.*, 2023 WL 4562031, at *12 (S.D.N.Y. July 14, 2023) (holding no-duty-to-deal case law did not apply where monopolist "dictate[s] the terms" of dealing and the terms have anticompetitive effects).[16] Tying conduct does not become insulated from review merely "because it was [initially] implemented by refusing to deal" with a rival. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 472 (7th Cir. 2020). Thus, the tying framework above applies and is easily satisfied.

That said, Align's termination of its earlier interoperability agreement with 3Shape (which had allowed doctors to order Invisalign directly through a 3Shape scanner) did constitute an unlawful refusal to deal with a rival. CC ¶¶ 73-77. Those allegations plainly satisfy the standard set forth in *Aspen Skiing* (even as Align frames it) because Align *did* terminate a prior profitable course of dealing, sacrificing short-term profits with no valid business justification, and solely to clear the way for the tying policy that would facilitate its *de facto* exclusive dealing. CC ¶¶ 8-9, 73-77. Align (impermissibly) reaches far beyond the pleadings and asks the Court to accept, now,

---

[16] *See* DOJ *Amicus* at 12 (explaining how "refusal to deal" framework does not apply "when a monopolist imposes on rival or non-rival trading partners conditions that restrict competition").

its untested, pretextual justification for the termination. Br. 13. In the Fifth Circuit, however, it is not sufficient that a defendant offer some "conceivable" rationale for refusing to deal with a rival; the defendant must prove that the purported justification was "credible" and was in fact the reason for the termination, which are fact-intensive inquiries not appropriately decided on this motion.[17] *Bell*, 847 F.3d at 1186; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483-485 (1992) (explaining that defendant's justifications may be rebutted, shown to be "pretext" or "outweighed by competitive effects"); *Covad Commc'ns Co. v. Bell Atlantic Corp.*, 398 F.2d 666, 676 (D.C. Cir. 2005) (purported justification "depends upon a question of fact" that cannot be decided on a motion to dismiss).[18,19]

[ redacted ]

---

[17] Nor would the pretextual justification Align offers (alleged patent infringement concerns) explain why Align refused interoperability agreements to other scanner companies. There is no requirement to show a prior profitable course of dealing to establish a refusal to deal claim. *Gov't Emps. Health Ass'n. v. Actelion Pharms Ltd.*, 2024 WL 4123511, at *6-7 (D. Md. Sept. 6, 2024).

[18] While the California district court credited Align's justification on summary judgment (deeming it "a close case"), 2024 WL 710623, at *1, the DOJ correctly explained that the court did so based on a misunderstanding of Ninth Circuit precedent, and that the court did not properly scrutinize whether the proffered justification was sufficient and non-pretextual. DOJ *Amicus* at 19-20.

[19] ClearCorrect's antitrust claims do not arise from Align's litigation tactics, *see, e.g.,* CC ¶¶ 221, 232, and therefore Align's *Noerr-Pennington* argument is inapplicable.

[20] ClearCorrect also alleged breach of the Agreement's no-admission provision but understands Align will stipulate not to use the fact of the settlement agreement as evidence of willfulness and/or alleged knowledge of infringement. ClearCorrect is willing to withdraw this counterclaim on that basis.

[ redacted ]



## CONCLUSION

The Court should deny Align's motion to dismiss in its entirety. To the extent the Court dismisses any claim, dismissal should respectfully be without prejudice with leave to amend to cure any deficiencies the Court identifies.

---



Dated: October 14, 2024

Respectfully submitted,

*/s/ Mark A. Ford*
Melissa R. Smith
Texas Bar No. 24001351
melissa@gillamsmithlaw.com
GILLAM AND SMITH, LLP
303 South Washington Avenue
Marshall, TX 75670
(903)934-8450
Fax: (903)934-9257

James Travis Underwood
Texas Bar No. 24102587
travis@gillamsmithlaw.com
GILLAM AND SMITH, LLP
102 N. College, Suite 800
Tyler, TX 75702
(903) 934-8450
Fax: (903)934-9257

Joseph J. Mueller
Vinita Ferrera
Mark A. Ford
Marissa A. Lalli
Holly A. Ovington
Harry Hanson
Tyler L. Shearer
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
joseph.mueller@wilmerhale.com
vinita.ferrera@wilmerhale.com
mark.ford@wilmerhale.com
marissa.lalli@wilmerhale.com
holly.ovington@wilmerhale.com
harry.hanson@wilmerhale.com
tyler.shearer@wilmerhale.com

Omar A. Khan
WILMER CUTLER PICKERING
  HALE AND DORR LLP
250 Greenwich Street

New York, NY 10007
(212) 230-8800
omar.khan@wilmerhale.com

Gerard A. Salvatore
Robert B. Stiller
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000
jerry.salvatore@wilmerhale.com
robert.stiller@wilmerhale.com

Hannah Santasawatkul
Texas State Bar No. 24107617
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1225 17th Street, Suite 2600
Denver, Colorado 80202
(720) 274-3135
hannah.santasawatkul@wilmerhale.com
***Attorneys for Defendant***
***Institut Straumann AG***

***Attorneys for Defendants and Counterclaim***
***Plaintiffs***
***ClearCorrect Operating, LLC***
***ClearCorrect Holdings, Inc.***

***Attorneys for Counterclaim Plaintiff***
***Straumann USA LLC***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). Plaintiff's counsel of record was served with a true and correct copy of the foregoing document by electronic mail on October 14, 2024

*/s/ Melissa R. Smith*
Melissa R. Smith